**The READER'S DIGEST ASSOCIATION, INC., Plaintiff,**

v.

**FEDERAL ELECTION COMMISSION, John W. McGarry, Frank P. Reiche, Joan D. Aikens, Thomas C. Harris, Robert O. Tiernan, Vernon W. Thomson, William F. Hildenbrand and Edmund L. Henshaw, Jr., as Members of the Federal Election Commission, Defendants.**

**No. 81 Civ. 596 (PNL).**

United States District Court, S. D. New York.

March 19, 1981.

---

Warshavsky, Hoffman & Cohen by David Cohen and Madelyn C. Littman, David Otis Fuller, Jr., and Ava K. Dopplet, New York City, for plaintiff.

Federal Election Commission by Charles N. Steele, Lawrence M. Noble and R. Lee Anderson, Washington, D. C., for defendants.

### OPINION AND ORDER

LEVAL, District Judge.

The Reader's Digest Association (RDA) sues to enjoin the Federal Election Commission (FEC) from proceeding with an investigation into whether RDA violated certain sections of the Federal Election Campaign Act of 1971, 2 U.S.C. § 431 et seq., "by making expenditures to disseminate to other media outlets video tapes of a computer reenactment of Senator Kennedy's accident at Chappaquiddick...." According to the

RDA, the video tape was part of a study commissioned from an engineer, Raymond McHenry, an expert in auto accident reconstruction, as research for a Reader's Digest article on the accident that appeared in the February 1980 issue. RDA states that on January 14, 1980, it distributed copies of the February issue, along with a press release, the McHenry study, six copies of the video tape, and a tidal current study, to major television networks, local television stations, and other media outlets. The article and the results of the studies contained in it were discussed on network news shows, and the NBC broadcast included a 12-second segment of the video tape. Affidavit of Fulton Oursler, Jr., a *Reader's Digest* Managing Editor.

In August, 1980, the FEC received a complaint alleging that RDA had violated the Act by making "an illegal corporate expenditure to negatively influence" the 1980 presidential election, based on RDA's purchase, in connection with the February 1980 article, of (1) a computer study of the speed at which Senator Kennedy's car was traveling when it crashed into the water; and (2) a study of the tides and currents in the area of Chappaquiddick Island, and (3) the production and distribution of video tapes of the computer reenactment to major media outlets. The Act, 2 U.S.C. § 441b(a), makes it illegal for "any corporation whatever . . . to make a contribution or expenditure in connection with any" federal election or primary. Section 441b(b)(2) defines "contribution or expenditure" as:

> "any direct or indirect payment, distribution, loan, advance, deposit or gift of money, or any services, or anything of value . . . to any candidate, campaign committee or political organization, in connection with any [federal] election . . ."

The statute creates an exclusion for:

> any news story, commentary or editorial distributed through the facilities of any broadcasting station, newspaper, magazine or other periodical publication, unless such facilities are owned or controlled by any political party, political committee, or candidate . . .

2 U.S.C. § 431(9)(B)(i).

Pursuant to the statute, RDA was notified, and mailed a copy, of the complaint. RDA responded with a letter claiming that the article was protected by the First Amendment and the news story exemption of 2 U.S.C. § 431(9)(B)(i), and that "requiring [RDA] to respond substantively . . . would impinge on its constitutional rights."

Thereupon, on November 11, 1980, pursuant to 2 U.S.C. § 437g(a)(2), the FEC found "reason to believe" that RDA violated the statute, with regard to an expenditure to disseminate to other media the computer reenactment video tapes. The FEC's reason-to-believe finding did not mention the funding of background research nor the publication of the article itself. The FEC then sent a letter to RDA requesting answers to 15 questions and production of a copy of the video tape; the letter did not order that any reply be made, nor was any subpoena issued. The 15 questions concern the content of the video tape, how it was obtained, and what use RDA made of it. After receiving an extension of time in which to respond, RDA filed this suit and did not otherwise answer the letter.[1]

Plaintiff claims the investigation is having, and will continue to have, a severe effect on its right to speak freely and comment on newsworthy events. RDA claims that since there is no time limit imposed by the Act or the regulations, the investigation may continue indefinitely and serves as a constant reminder that articles about political figures may result in governmental scrutiny and "interrogation," disclosure of news sources, and attendant economic burdens. RDA asserts that responding to the investigation will require a great deal of time, effort, and money, for attorneys' fees, searching documents, and preparing written responses, with the claimed result of making publishers more reluctant to take on controversial political stories. This, plain-

---

1. The FEC has stated that "nearly all" of the 15 questions were answered in RDA papers filed with this Court. Defendants' Memorandum in Opposition to Plaintiff's Motion, at 4.

tiff claims, is a "chilling effect" prohibited by the first amendment.

RDA also claims that the statute was not meant to regulate this type of activity. In support, RDA cites the news-story exemption noted above, 2 U.S.C. § 431(9)(B)(i), and the regulations issued pursuant to the statute, which provide that "[a]ny cost incurred in covering or carrying a news story, commentary, or editorial by a broadcasting station, newspaper, magazine, or other periodical publication is not an expenditure ..." 11 C.F.R. § 100.8(b)(2). RDA claims that its expenditures are excluded from the Act, and that these exclusions are required to avoid a conflict between the Act and the First Amendment.[2]

The FEC contends that this investigation is at its most preliminary stage, at which point it has no detrimental effect on RDA. After this investigation is completed, the Office of the General Counsel can recommend that the FEC find probable cause to believe a violation occurred. 2 U.S.C. § 437g(a)(3). If that happens, RDA will be given a copy of the General Counsel's brief and an opportunity to reply, raising all factual and legal arguments. *Id.* After reviewing the briefs, the FEC can determine there is probable cause to believe a violation occurred. If probable cause is found, there is a mandatory requirement that the FEC try, for not less than 30 days, nor more than 90 days, to reach a voluntary agreement with the alleged violator. 2 U.S.C. § 437g(a)(4)(A)(i). If no agreement is reached, the FEC would then vote on whether to bring action in the district court, where the defendant would be entitled to a de novo trial. 2 U.S.C. § 437g(a)(6)(A). The FEC also emphasizes that it has not served a subpoena upon RDA; if it does, RDA could move to quash the subpoena.

■ The FEC therefore contends both that the Act provides adequate remedies at law for plaintiff's claim, thereby obviating the need for equitable relief, and that the claim lacks ripeness. The test of ripeness

for review of agency determinations comes from *Abbott Laboratories v. Gardner*, 387 U.S. 136, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967). This is a two-part test, requiring the Court to evaluate (1) the fitness of the issues for judicial decision, including a determination of whether the issue tendered is legal or factual, and whether the conduct is "final agency action" within § 10 of the Administrative Procedure Act, 5 U.S.C. § 704; and (2) the hardship to the parties of withholding court consideration.

In the recent case of *Federal Trade Commission v. Standard Oil Company of Calif.*, —— U.S. ——, 101 S.Ct. 488, 66 L.Ed.2d 416 (1980) ("*Socal*"), the Supreme Court held that an FTC complaint, finding reason to believe that Socal was violating the FTCA, was not final agency action and therefore was not ripe for judicial review under *Abbott*. Under the relevant provisions of the FTCA, the respondent could present evidence at a hearing before an Administrative Law Judge, whose decision would be appealable to the full FTC. If the FTC entered a cease and desist order, the respondent would not be bound by the decision until judicial review was complete or the opportunity for review had lapsed. The reason to believe finding was therefore "a prerequisite to a definitive agency position ... but itself ... a determination only that adjudicatory proceedings will commence." The Court found that the "reason to believe" complaint did not have the legal force or effect upon the defendant's daily business that the court had found in Abbott, where the defendants would either "risk serious criminal and civil penalties" for non-compliance, or have to change all their labels, advertisements, and printed materials to comply with the challenged regulations. The only burden on the defendant in *Socal* was the burden of responding to the charges; on the other hand judicial review at such a premature stage would have interfered with the proper functioning of the agency and burdened the courts. At ——, 101 S.Ct. at 493.

---

2. RDA also maintains that the expenditures in question are not prohibited by the statute, since they were not made to any "candidate, campaign or political party or organization." However, the statute also covers indirect payments, 2 U.S.C. § 431(9)(B)(i).

The circumstances here presented differ from those in *Socal* in three important respects. First, while Socal conceded that the pendency of the complaint had no practical effect on its conduct of its affairs, at ——, 101 S.Ct. at 493, RDA contends that its present editorial policy is intimidated by concern lest it subject itself to further investigation. Second, the express statutory exemption in favor of dissemination of information or opinion by the press seems intended to bar the FEC from even investigating incidents that are exempted exercises of the press' prerogatives. Third, this dispute involves First Amendment considerations based on a recognition that freedom of the press is substantially eroded by investigation of the press, even if legal action is not taken following the investigation. Those concerns are particularly acute where a governmental entity is investigating the press in connection with the dissemination of political matter. These factors support the interpretation of the statutory exemption as barring even investigation of press activities which fall within the exemption.

Both the constitution and the statutory exemption for press activities suggest that the *Socal* ruling deferring judicial scrutiny until a later stage in the administrative process is not properly applicable to these circumstances. This is easily demonstrated in the context of a more extreme example:

If a newspaper relying on a secret source were publishing a series of articles containing derogatory information about the incumbent President during his campaign for reelection, and the FEC undertook to investigate the newspaper asking among other questions the source of the information published, could it seriously be contended that an application by the newspaper for judicial intervention would be premature because of the preliminary stage of the FEC's proceedings? In my view the statute, in creating an exemption for the press in its news and opinion dissemination function, commands the FEC not even to investigate such circumstances and authorizes court intervention if the FEC oversteps the limitation.

This observation does not, however, dispose of the issue. The press exemption has certain limitations. First, in exempting the "distribut[ion]" of news or commentary "through the facilities of any broadcasting station, newspaper, magazine or other periodical publication ...", the statute would seem to exempt only those kinds of distribution that fall broadly within the press entity's legitimate press function. It would not seem to exempt any dissemination or distribution using the press entity's personnel or equipment, no matter how unrelated to its press function. If, for example, on Election Day a partisan newspaper hired an army of incognito propaganda distributors to stand on street corners denouncing allegedly illegal acts of a candidate and sent sound trucks through the streets blaring the same denunciations, all in a manner unrelated to the sale of its newspapers, this activity would not come within the press exemption—even though it might comply with a technical reading of the statutory exemption, being a "news story ... distributed through the facilities of ... [a] newspaper."

The second limitation on the press exemption is that press "facilities owned or controlled by any political party, political committee or candidate" are outside the exemption.

There should be no question that the FEC is authorized by the statute to pursue its investigation at least for the limited purpose of determining whether the press exemption is applicable. Accordingly it would be appropriate for the FEC to investigate whether a press entity charged with a violation is owned or controlled by a party or candidate and whether the distribution complained of was of the type exempted by the statute. Without conducting such a limited investigation the FEC would be unable to determine whether the acts complained of fell within the statute's press exemption.

■ In my view, the statute calls for a two step process when a substantial complaint is received alleging a violation of the statute by a press entity. In the first

stage, until and unless the press exemption were found inapplicable, the FEC is barred from investigating the substance of the complaint. No inquiry may be addressed to sources of information, research, motivation, connection with the campaign, etc. Indeed all such investigation is permanently barred by the statute unless it is shown that the press exemption is not applicable. The only investigation permitted in the first stage is into the two questions on which the exemption turns—whether the press entity is owned by the political party or candidate and whether the press entity was acting as a press entity in making the distribution complained of. If the Commission makes a finding of probable cause that the press exemption did not apply to the circumstances, see § 437g(a)(3), then and only then would investigation be permitted into whether a substantive violation had occurred.

No explicit reference is to be found in the statute to this two-step process. It seems to me, however, to be the necessary accommodation between, on the one hand, the Commission's duty to investigate possible violations and, on the other, the statutory exemption for the press combined with a First Amendment distaste for government investigations of press functions.

■ The issue of ownership or control by a party or candidate does not appear to be of concern in this case. None of the questions put to RDA by the FEC is addressed to this issue.

The FEC does appear to have been concerned with the question whether the other limitation is applicable. As noted above, only the dissemination to other media of the video tapes was within the FEC's reason to believe finding, suggesting a recognition by the FEC that the research and the publication of the article were on their face exempt functions. It seems appropriate within the framework of the statutory exemption for the FEC to investigate the limited

question whether in disseminating the tape, RDA was acting in the context of the distribution of a news story through its facilities or whether it was acting in a manner unrelated to its publishing function.

To the extent that the investigation is directed to that question, I conclude there would be no basis for the injunction sought by RDA. The press exemption would not protect RDA if its dissemination of the tape had nothing to do with its press function as a magazine publisher.

On the other hand, if RDA was acting in its magazine publishing function,—if, for example, the dissemination of the tape to television stations was to publicize the issue of the magazine containing the Chappaquiddick article, then it would seem that the exemption is applicable and that the FEC would have no occasion to investigate whether the dissemination or the publication constituted an attempt to influence an election.

I conclude that so long as the FEC is investigating the limited question whether RDA was acting in its magazine publisher capacity in distributing the tape, so as to determine whether the press exemption is applicable, and so long as the investigation does not address itself to issues beyond this proper subject, there is no basis to grant the injunction sought by RDA.

Of the questions put by the FEC to RDA in its letter about half appear directed toward the appropriate question (Nos. 3, 5, 6, 7, 11, 13, 14 and 15). Curiously, none of these questions directly addresses what seems to be the crucial issue: Was the distribution of the tape publicity for the Chappaquiddick issue?[3] If the answer to that question was convincingly in the affirmative, there would be no further basis for investigation.

The other questions, as noted above, go beyond what I consider to be the permitted scope of the FEC's investigation at this

---

**3.** Question 3 comes close in asking whether the tape "advertised" the February issue. It appears from the information submitted that the tape was part of the content of the article. It did not advertise the article. The question should be whether the *distribution* of the tape was publicity for the article.

stage. They inquire into the source of the tape, whether it summarized a study, whether RDA received payment, what uses were made by others of the tape, whether the tape was intended to publicize the results of a study of the Chappaquiddick incident, and what was the content of the tape. Such questions may become appropriate if RDA was not acting in its press capacity in distributing the tape. Pending such a determination, in my view they may not be asked.

Nonetheless it seems unnecessary at this point to grant an injunction merely because the letter of inquiry was slightly overbroad. RDA is under no legal compulsion to answer the letter. The FEC appears by its actions to recognize the limited proper subject for its opening inquiry—the availability of the exemption. If the FEC should pursue an attempt to investigate beyond the permitted scope as outlined in this opinion, RDA may reapply for an injunction.

The motion is denied.