**FEDERAL ELECTION COMMISSION,**
Petitioner,

v.

**PHILLIPS PUBLISHING, INC.,**
Respondent.

Misc. No. 81–0079.

United States District Court,
District of Columbia.

July 16, 1981.

Charles N. Steele, Lawrence M. Noble, Nancy B. Nathan, Washington, D. C., for petitioner.

Jack C. Landau, Clemens P. Work, Sharon P. Mahoney, Washington, D. C., for The Reporters Committee for Freedom of the Press.

Paul D. Kamenar, Washington, D. C., for respondent.

## MEMORANDUM OPINION

FLANNERY, District Judge.

### I. Background

This action is before the court on the petition of the Federal Election Commission (FEC) for court enforcement of two Commission orders to answer written questions. The Commission orders are addressed to Thomas Phillips and Ronald Pearson. The questions seek detailed information about the personnel and operations of Phillips Publishing, Inc. and one of its bi-weekly newsletters, *The Pink Sheet on the Left.*

Respondent Phillips Publishing, Inc. publishes ten newsletters on various topics, including satellite, telephone, radio, and video technology, retirement, travel, and real estate. *The Pink Sheet on the Left* is a conservative, anti-communist publication with an annual subscription rate of $39 and a circulation of approximately 14,000. It has been in existence for over ten years. *The Pink Sheet* and Phillips Publishing are neither owned nor controlled by any political party, political committee, or candidate. Affidavit of Thomas Phillips ¶ 5.

In early 1980 while Senator Edward Kennedy was a candidate for the Democratic Presidential nomination, Phillips Publishing sent a mailing to regular and potential subscribers soliciting subscriptions to *The Pink Sheet* and seeking donations for placing the newsletter in college libraries. The mailing included a one-page letter from Thomas Phillips, the publisher of the newsletter; a three-page letter from Ronald Pearson, managing editor; a one-page series of quotations endorsing the newsletter; and a one-page combination subscription order form and "Teddy Kennedy Opinion Poll" which could be completed and returned to the newsletter. The mailing appealed to political conservatives and strongly emphasized *The Pink Sheet*'s opposition to the campaign and philosophy of Senator Kennedy.

On March 18, 1980, the Kennedy for President Committee filed a complaint with the FEC alleging that *The Pink Sheet* promotional material which advocated the defeat

of Senator Kennedy violated four provisions of the Federal election laws. On March 24, 1980, the FEC notified Thomas Phillips, the owner and president of Phillips Publishing, that a complaint had been filed against him and requested that he respond to the Kennedy complaint within 15 days. Phillips Publishing responded to the FEC on April 11, 1980. It stated that *The Pink Sheet* was a periodical, was not controlled by any party, candidate, or committee, and therefore promotional material distributed by it was exempt from FEC regulation under 2 U.S.C. § 431(9)(B)(i).

On June 24, 1980 the FEC found "reason to believe" that the respondent had violated 2 U.S.C. §§ 433, 434(c)(1), 435(b), 441b, and 441d, and initiated an investigation pursuant to 2 U.S.C. § 437g(a)(2). Briefly, § 433 requires political committees to register with the FEC; § 434(c)(1) requires anyone other than a political committee who makes independent political expenditures in excess of $250 to file certain reports; § 435(b) was repealed January 8, 1980; [1] § 441b prohibits labor unions and corporations from making contributions to or expenditures for candidates in federal elections; and § 441d requires anyone who makes an independent expenditure or solicits political contributions to state whether or not the candidate paid for the communication.

The FEC notified respondent of its "reason to believe" finding by a letter dated June 26, 1980. The notification identified the following excerpts from *The Pink Sheet*'s promotional material as being in violation of federal election laws:

1. "We must stop Kennedy before he seizes the Presidency."
2. "You can help with this effort to stop Teddy Kennedy."
3. "You learn how you can use this valuable information to help defeat Teddy Kennedy's drive for the Presidency."
4. "Whether you are a man or woman, young or old, a businessman, teacher, student, employee, employer, union member or government worker—you can actually help combat Teddy Kennedy and advance the cause of conservatism in America."

The Commission's letter went on to explain its determination that *The Pink Sheet*'s solicitation letter is not covered by the press exemption contained in § 431(9)(B)(i):

In your letter dated April 11, 1980, you defend your clients on the ground that the activity in which the Phillips Publishing Inc. and The Pink Sheet On The Left were engaged is exempt from the definition of "expenditures" under 2 U.S.C. § 431(9)(B)(i):

"any news story, commentary, or editorial distributed through the facilities of any broadcasting station, newspaper, magazine, or other periodical publication, unless such facilities are owned or controlled by any political party, political committee, or candidate."

As the questioned communication is not a news story, commentary or editorial, the Commission has determined that the exemption of 2 U.S.C. § 431(9)(B)(i) is not available. Furthermore, the Commission has determined that the questioned communication was not distributed through the facilities of a periodical publication. This determination is based upon a facial comparison of the questioned communication to a copy of the periodical *The Pink Sheet On The Left* as exhibited in your letter dated April 11, 1980. Unlike the newsletter submitted by you, the title of the questioned communication is not in the same format as the title of the regular Pink Sheet publication (e. g., there is a difference in type). Furthermore, the questioned communication does not contain legends normally carried on the publication (e. g. "America's Authoritative Report on Left-Wing Activities", or the legend bearing the names of staff officers, subscription rates, copyright date etc.) In addition, the content of the Pink Sheet publication has a different format than the questioned communication. For example, the publication is normally laid out in subheadings followed by editorial comment. Finally, the questioned com-

---

1. Pub.L.No. 96–187, Title I, § 105(1), 93 Stat. 1354.

munication bears the salutation of "Dear Friend" as opposed to "Dear Subscriber" which is printed in the Pink Sheet Publication. In light of these considerations, the Commission has determined that your clients cannot claim the exemption afforded by 2 U.S.C. § 431(9)(B)(i).

FEC letter, June 26, 1980 at 2 n.1. Included with the FEC's notification letter were two sets of interrogatories, one directed to Thomas Phillips and one directed to Ronald Pearson.

The FEC voted on October 7, 1980 to order respondent to answer the interrogatories. On October 24 Thomas Phillips and Ronald Pearson filed a motion to quash with the FEC, which was denied on December 17, 1980. After being notified that it would receive no further responses to its questions, the FEC filed this action on April 8, 1981. Respondent has filed a motion to dismiss, a counterclaim, and a motion for preliminary injunction which seeks to enjoin the FEC from investigating or taking any other action with respect to *The Pink Sheet* and its promotional material.

## II. Discussion

### A. Standard of Review

█ When a party refuses to obey a subpoena or order of the FEC, a federal court may issue an order requiring compliance. 2 U.S.C. § 437d(b). In the context of commercial and corporate matters, subpoenas are entitled to court enforcement if "the inquiry is within the authority of the agency, the demand is not too indefinite, and the information sought is reasonably relevant." *United States v. Morton Salt*, 338 U.S. 632, 652, 70 S.Ct. 357, 369, 94 L.Ed. 401 (1950). While courts have generally been favorably disposed to enforcing agency subpoenas without looking closely at the agency's subject matter jurisdiction over the area being investigated, this court must "exercise particular care in assuring itself that subject matter jurisdiction does exist." *Federal Election Commission v. Machinists Non-Partisan Political League*, 655 F.2d 380 at 386 (D.C.Cir.1981) (hereinafter *"MNPL"*).

In *MNPL* the FEC found "reason to believe" that MNPL violated 2 U.S.C. § 441a(a)(2) by contributing more than $5,000 to four "draft Kennedy" organizations formed to promote the acceptance of presidential candidacy by Senator Kennedy. The Commission then issued a sweeping subpoena to MNPL, which was enforced by the district court. The court of appeals vacated the enforcement order on the ground that the subpoena exceeded the FEC's subject matter jurisdiction.

█ Four factors in *MNPL* convinced the court that the deference courts usually give to agencies' business-related subpoena enforcement requests was unwarranted and that the court should carefully scrutinize the FEC's subject matter jurisdiction. Each of the factors present in *MNPL* are present in this case. First, the *MNPL* court was concerned because the investigation at issue was a "novel extension of the Commission's investigative authority." *Id.* at 387. Here the FEC has initiated an investigation of a newsletter because it opposed a political candidate as a method to attract subscribers. While the FEC has initiated a somewhat similar investigation on at least one other occasion, *see Reader's Digest Association v. Federal Election Commission*, 509 F.Supp. 1210 (S.D.N.Y.1981) (investigation of magazine publisher to determine whether distribution of videotapes of computer reenactment of Senator Kennedy's accident at Chappaquidick constituted illegal corporate contribution), on another occasion the FEC appears to have recognized such promotional activities as permissible under the election laws.

In MUR (Matter Under Review) 296(76), the FEC dismissed an internally generated complaint against *Penthouse Magazine*. *Penthouse* paid for an advertisement which appeared in newspapers shortly before the 1976 presidential elections. The advertisement publicized the November issue of the magazine. It depicted Jimmy Carter in an unfavorable light and warned readers not to vote until they had read an article in the November issue. The FEC dismissed the

complaint upon the recommendation of the General Counsel, who noted that the "ad is most logically construed on its face as an effort, albeit suggestive, to promote a commercial venture—namely, the selling of a magazine with a controversial article regarding Mr. Carter." The General Counsel went on to mention "the overriding protection of the First Amendment in this area." *See* Respondent's Ex. 21. Thus while the investigation in this case does not constitute "an unprecedented assertion of subject matter jurisdiction for the FEC," *MNPL*, at 386, it can still be considered a novel extension of FEC authority in light of the FEC's previous reluctance to investigate similar advertising and in light of the concern expressed in *Reader's Digest* over the authority of the FEC to conduct its investigation in that case. *See Reader's Digest, supra*, 509 F.Supp. at 1214, *quoted in MNPL, supra*, at 396 n.32.

The second factor the court in *MNPL* relied upon was the "difference between the scope of investigatory authority vested in agencies such as the FTC, SEC, or the Administrator of Labor's Wage and Hour Division on the one hand, and the FEC on the other." *Id.* at 387. Judge Wald's conclusion that the FEC does not have the broad investigatory powers vested in those agencies is equally valid here. Similarly, the third and most important reason for heightened scrutiny, the "potential for chilling the free exercise of political speech and association guarded by the first amendment" is also present here. *Id.* at 388. Finally, just as in *MNPL*, this court's examination of subject matter jurisdiction rests principally upon a legal interpretation of the statute.

An additional reason the court should carefully scrutinize subject matter jurisdiction in this case is found in the statutory exemption provided for press activities. Phillips Publishing has consistently maintained that the promotional materials in question are exempt from the FEC regulation under 2 U.S.C. § 431(9)(B)(i), which exempts from the definition of expenditures

any news story, commentary, or editorial distributed through the facilities of any broadcasting station, newspaper, magazine, or other periodical publication, unless such facilities are owned or controlled by any political party, political committee, or candidate.

The legislative history of this section further indicates that Congress meant for the exemption to be a broad one:

> [I]t is not the intent of the Congress in the present legislation to limit or burden *in any way* the first amendment freedoms of the press and of association. Thus the exclusion assures the unfettered right of the ... media to cover and comment on political campaigns.

H.Rep.No.93–943, 93d Cong., 2d Sess. at 4 (1974) (emphasis added).

### B. Subject Matter Jurisdiction

Having concluded that subject matter jurisdiction warrants careful scrutiny in this case, the court now turns to an examination of the statute as it applies to the facts in this action. *Reader's Digest, supra*, is the only case of which this court is aware where the FEC has asserted jurisdiction over a press entity. *Reader's Digest* commissioned a study of Senator Kennedy's accident at Chappaquidick as research for an article which appeared in the magazine's February 1980 issue. Part of the study included a video tape of a computer reenactment of the accident. The magazine distributed copies of the video tape and the article to television networks, local television stations, and other media outlets. The FEC found "reason to believe" that expenditures to disseminate the video tape violated 2 U.S.C. § 441b(a), which makes illegal any corporate contribution or expenditure in a federal election or primary. After refusing to answer written questions propounded by the FEC, *Reader's Digest* sued to enjoin the FEC from proceeding with an investigation.

The *Reader's Digest* court adopted a two-step procedure for dealing with allegations that a press entity has violated federal election laws. The procedure recognizes the FEC's need to conduct an inquiry in order to determine whether conduct falls within

the statute's press exemption, while at the same time strictly limiting the inquiry in order to minimize harm to First Amendment values. Under the *Reader's Digest* procedure, the initial inquiry is limited to whether the press entity is owned or controlled by any political party or candidate and whether the press entity was acting as a press entity with respect to the conduct in question. *Reader's Digest, supra,* 509 F.Supp. at 1214–1215. *See also MNPL, supra,* at 396–397 (*citing* Reader's Digest with approval). If the press entity is not owned or controlled by a political party or candidate and it is acting as a press entity, the FEC lacks subject matter jurisdiction and is barred from investigating the subject matter of the complaint. Thus in *Reader's Digest* the court allowed limited investigation to determine whether dissemination of the tape was part of *Reader's Digest's* press function as a magazine publisher. *Reader's Digest, supra,* 509 F.Supp. at 1215.

■ The rule in this circuit is that if the court finds the FEC needs "additional factual information before a decision on the jurisdiction question can reasonably be made," it "*may* adopt a two-step procedure similar to the one used in *Reader's Digest Ass'n v. FEC.*" *MNPL, supra,* at 396 (emphasis added). There is no need for the FEC to obtain additional factual information in this case. As early as April, 1980, the FEC received responses from Phillips Publishing, through its counsel, stating that *The Pink Sheet* and its publisher "are not political committees, do not solicit or receive any political contributions, or make any contributions to any candidate," and this is confirmed by the uncontroverted affidavit of the owner of Phillips Publishing. Affidavit of Thomas Phillips ¶ 5. The FEC has not offered this court any evidence or even a theory suggesting that *The Pink Sheet* is owned or controlled by any political party or candidate, yet it seeks detailed information about the staff of *The Pink Sheet,* their political affiliations, and the publication's finances.

Similarly, it is clear that the respondent was acting in its capacity as the publisher of a newsletter in printing and distributing the solicitation letter for *The Pink Sheet.* The court takes judicial notice of the fact that newsletters and other publications solicit subscriptions, and in their advertising doing so, they publicize content and editorial positions. If there is any doubt remaining as to whether the solicitation letter was distributed as part of the normal functions of a press entity, those doubts are dispelled by an examination of the newsletter and a copy of the solicitation letter. As the court explained in *Reader's Digest,*

[I]f RDA was acting in its magazine publishing function,—if, for example, the dissemination of the tape to television stations was to publicize the issue of the magazine containing the Chappaquidick article, then it would seem that the exemption is applicable . . .

*Reader's Digest, supra,* 509 F.Supp. at 1215. Because the purpose of the solicitation letter was to publicize *The Pink Sheet* and obtain new subscribers, both of which are normal, legitimate press functions, the press exemption applies.

The FEC argues that *MNPL* does not apply to this case. In *MNPL* the FEC's assertion of jurisdiction rested "solely upon a legal interpretation of the statute which [did] not depend upon any facts sought to be gleaned through the subpoena." *MNPL, supra,* at 390. The Commission contends that whether the solicitation letter at issue in this case constituted a normal newsletter activity is a factual issue subject to further inquiry. The court disagrees. This case differs from *Reader's Digest,* where the court in effect treated the issue of what constituted the normal functions of the magazine as a factual issue and allowed the FEC limited inquiry. There the FEC did not have in its possession the tape; here the FEC has been provided with the solicitation letter at issue and another solicitation letter critical of Jimmy Carter, as well as back issues of the newsletter. More importantly, while circulation of a video tape to publicize a magazine article may well be a normal press function, it is certainly more unusual and thus subject to greater scrutiny than a

routine mailing soliciting new subscribers for a publication.

There must be some threshold showing of wrongdoing on the part of respondent if the press exemption is to serve the purpose for which it was intended. Here the FEC has not challenged the representation by Phillips Publishing that it is not owned or controlled by any political party or candidate, that it frequently sends material through the mail soliciting subscriptions to *The Pink Sheet*, and that the materials at issue were sent as promotional materials to seek new subscribers. *See* Affidavit of Thomas Phillips ¶ 5–9. Rather, the FEC's petition to enforce its orders to answer written questions is based solely on conjecture that a violation may have occurred. However, "mere 'official curiosity' will not suffice as the basis for FEC investigations, as it might in others," *MNPL, supra,* at 388, and the Supreme Court has warned that "the power of compulsory process [must] be carefully circumscribed when the investigative process tends to impinge on such highly sensitive areas of freedom of speech or press, freedom of political association, and freedom of communication of ideas." *Sweezy v. New Hampshire,* 354 U.S. 234, 245, 77 S.Ct. 1203, 1209, 1 L.Ed.2d 1311 (1957). *See also Securities and Exchange Commission v. McGoff,* D.C.Cir., 647 F.2d 185, 191 (balancing or special sensitivity required in subpoena enforcement action against press entity). Accordingly, since the FEC has made no threshold showing that a violation may have occurred and it is extremely unlikely that a violation will be found, and since there is a danger further FEC inquiry would impinge upon First Amendment freedoms, the FEC's petition must be denied.

This opinion should not be read to imply that FEC enforcement requests should always be denied where a press entity is the subject of a "reason to believe" finding and the FEC seeks further information. Clearly further investigation would be warranted if *The Pink Sheet* had not been in existence for over 10 years but rather had been established for the sole purpose of supporting or opposing a candidate, or if the FEC had some evidence linking *The Pink Sheet* with a political organization or candidate. However, *MNPL* makes clear that the district court need not permit further investigation by the FEC if additional factual information is not needed to determine whether the FEC has jurisdiction, and no further fact-finding is necessary in this case in order to hold the FEC lacks jurisdiction.