## ELECTION LAW

CAMPAIGN    FINANCE   –   IN-KIND   CONTRIBUTION   –
    CONSTITUTIONAL LAW – FREEDOM OF SPEECH


May 24, 2010


*Ms. Linda H. Lamone, Administrator*
*Maryland State Board of Elections*

You have requested legal advice regarding a letter submitted
to the State Board of Elections ("SBE") by the Maryland Democratic
Party alleging that former Governor Robert Ehrlich and WBAL
Radio have violated Maryland's campaign finance law.  In essence,
the letter asserts that, because the former Governor acts as host or
co-host of a show on WBAL Radio, the station has made an illegal
in-kind contribution to his gubernatorial campaign.  The legal issue
concerns the circumstances under which the broadcast of political
discussion or commentary by a candidate or prospective candidate
would amount to an in-kind contribution by the broadcaster.

In general, state efforts to regulate media appearances by a
candidate, potential candidate, or others through a state's campaign
finance laws raise significant First Amendment concerns.  This is
true even where the person appearing has some practical control
over the content of the broadcast, including as host.  Significantly,
research by our Office has revealed no recent instances, under either
federal law or the laws of other states, where in-kind contribution
limits have been successfully applied in the way urged by the
complaint.  To the contrary, courts have routinely disapproved
efforts to closely regulate the content of print or broadcast media
featuring political discussion. The role of the candidate or potential
candidate in that discussion does not fundamentally change that
analysis.  Our Office therefore advises that, consistent with its past
practice with respect to  media coverage of a candidate or potential
candidate, SBE should decline to treat the radio broadcasts
complained of as an illegal contribution to the Ehrlich campaign.

Several objective, content-neutral factors may be of special
relevance. First, if the radio show at issue significantly pre-dates the
current campaign season, it is unlikely that a court would find the
station created the program  as a vehicle to promote an actual or
prospective candidacy.  Second, a live call-in show featuring

political discussion that is similar in format to other broadcasts regularly aired by the station would tend to negate an inference that the show was created especially for a campaign purpose. Third, if the program appears to be part of the station's ordinary broadcasting business, sponsored by paid commercial advertisements, that, too, makes it unlikely the program would be deemed a contribution to a particular campaign. In such circumstances, it would not appear that a station has donated to a campaign free air-time for which it would ordinarily charge a fee. *Cf.* Letter from Assistant Attorney General Kathryn M. Rowe to Delegate George W. Owings, III (August 25, 1994) (concluding that political use of a public access channel is not an in-kind contribution, in part because the cable franchisee does not charge for time). Therefore, regardless of any reason a candidate or potential candidate might have for hosting this type of show, from the station's perspective, the show would not amount to an unpaid "infomercial."

Unquestionably, Maryland has a strong interest in preventing the evasion of its campaign finance limits through indirect means. This includes, of course, misconduct by media companies. But the First Amendment demands a lighter touch in this area, due to the media's role in providing a forum for public debate. This calls for a regulatory approach narrowly tailored to prevent the threatened harm, while avoiding unnecessary burdens on political speech. In our view, applying in-kind contribution limits to the type of activity at issue here would not be sufficiently tailored to the problem to justify its likely impact on political speech. Accordingly, SBE should treat a broadcast hosted by a candidate or potential candidate no differently than it does other appearances or commentary by political figures in the print or broadcast media.

Greater scrutiny may be appropriate during the period immediately preceding the election, when both the temptation to abuse and the potential for harm are at their greatest. *See e.g.*, *Citizens United v. Federal Election Comm'n*, 130 S.Ct. 876, 895 (2010) ("It is well known that the public begins to concentrate on elections only in the weeks immediately before they are held."). Other regulations, such as the Federal Communication Commission's ("FCC") "equal time" rule, are specifically targeted at such pre-election campaign activity. In any event, because we

understand that this latter issue is not immediately of concern, it is not addressed in this advice letter.[1]

# I

## Background

### A. First Amendment Standards

A major purpose of the First Amendment is "to protect the free discussion of governmental affairs ... includ[ing] discussions of candidates." *Buckley v. Valeo*, 424 U.S. 1, 14 (1976). The First Amendment guarantee "'has its fullest and most urgent application' to speech uttered during a campaign for political office." *Eu v. San Francisco County Democratic Central Comm.*, 489 U.S. 214, 223 (1989) (quoting *Monitor Patriot Co. v. Roy*, 401 U.S. 265, 272 (1971)). More recently, the Supreme Court has warned against laws that, either through imprecision or complexity, impose impermissible burdens or uncertainties on speakers "discussing the most salient political issues of our day." *Citizens United*, 130 S.Ct. at 888. "Because First Amendment freedoms need breathing space to survive, government may regulate in the area only with narrow specificity." *NAACP v. Button*, 371 U.S. 415, 433 (1963).

This need for specificity means that not all campaign-related speech may be regulated. Only campaign speech that can be identified as "express advocacy or its functional equivalent" meets a sufficiently definite standard that it may be subject to some government imposed limits. *Federal Election Comm'n v. Wisconsin Right to Life*, 551 U.S. 449, 469-70 (2007) ("WRTL").[2] Therefore, in the case of a radio broadcast involving a candidate or potential candidate, the question whether the appearance is subject to regulation, including as an in-kind contribution, arises *only* to the

---

[1] According to public statements by the Ehrlich campaign and WBAL station management, the program will not be aired after the former Governor files a certificate of candidacy on or before the July 6, 2010 deadline. From that date, the FCC's "equal time" rule would apply to any "use" of the station by a filed candidate. *See* 47 U.S.C. §315(a); 47 CFR §73.1940 *et seq.*

[2] The "functional equivalent" of express advocacy is a political message that is "susceptible of no reasonable interpretation other than as an appeal to vote for or against a specific candidate." *WRTL*, 551 U.S. at 469-70.

extent the broadcast involves express advocacy or its equivalent. If it does not, no further analysis is needed; the First Amendment precludes regulation of the appearance through campaign finance laws. If the broadcast *does* involve express advocacy or its equivalent, the issue becomes whether the purported restriction may be constitutionally applied. *See, e.g.*, *Citizens United*, 130 S. Ct. at 898 ("Laws that burden political speech are subject to strict scrutiny, which requires the Government to prove that the restriction furthers a compelling interest and is narrowly tailored to achieve that interest.")(citation and internal quotations omitted).

States have a strong interest in enacting laws to preserve the integrity and fairness of the electoral process. *Federal Election Comm'n v. National Right to Work Comm.,* 459 U.S. 197, 208 (1982). This includes measures relating to campaign finance. *Buckley*, 424 U.S. at 26-29; *see also Nixon v. Shrink Missouri PAC*, 528 U.S. 377, 389 (2000). Limits on campaign contributions – which generally have their most direct impact on the First Amendment right of free association, *see Buckley,* 415 U.S. at 25 – are subject to a somewhat less rigorous standard of review than are more direct restrictions on speech. In analyzing laws that limit campaign contributions, courts will uphold the restriction if it promotes a "sufficiently important" government interest and is "closely drawn" to avoid unnecessary abridgment of the right to free association. *Id*. Under either standard, however, the test to be applied is a demanding one.

With regard to dollar limits on the value of contributions, the Supreme Court has recognized two "sufficiently important" state interests: an "anti-corruption" interest and an "anti-circumvention interest." The first embraces not only express or implied *quid pro quo* arrangements, but also the threat of undue influence by large donors over elected officials, or the appearance of it, which undermines public confidence in the integrity and fairness of the electoral system. *Buckley,* 424 U.S. at 26-29; *see also Shrink Missouri PAC*, 528 U.S. at 389 ("In speaking of improper influence and opportunities for abuse ... we recognized a concern not confined to bribery of public officials, but extending to the broader threat from politicians too compliant with the wishes of large contributors."). The second interest is furthered by measures designed to prevent evasion or circumvention of legitimate campaign finance restrictions, so that individuals or organizations may not undermine valid contribution limits indirectly. *See Buckley*, 414 U.S. at 46-47. In-kind contribution limits promote both of these interests.

## B. *Federal Media Exception*

Federal law provides a useful example of how First Amendment values may be accommodated in campaign finance regulation. The Federal Election Campaign Act ("FECA"), 2 U.S.C. §431, *et seq.*, was amended shortly after its enactment to provide a specific statutory exception for most media appearances by a candidate. *See* 2 U.S.C. §431(9)(B)(i). When it added the media exception in 1974, Congress indicated that it was intended to make clear that campaign finance regulation would not "limit or burden in any way the First Amendment freedoms of the press and of association. Thus the exclusion assures the unfettered right of the ... media to cover and comment on political campaigns." H. Rep. No. 93-943, 93d Congs., 2d Sess. at 4 (1974); *see also First National Bank of Boston v. Bellotti*, 435 U.S. 765, 781 (1978) (discussing rationale for media exception). This special protection of press freedoms is justified not because of any special privilege the press enjoys, but because press entities serve a critical role in our society as a forum for public debate.[3]

Under regulations adopted pursuant to FECA, contributions and expenditures are defined so as to exclude "any cost incurred in covering or carrying a news story, commentary, or editorial by any

---

[3] The Supreme Court has explained:

> The press cases emphasize the special and constitutionally recognized role of that institution in informing and educating the public, offering criticism, and providing a forum for discussion and debate. *Mills v. Alabama*, 384 U.S., at 219, 86 S.Ct., at 1437; *see Saxbe v. Washington Post Co.*, 417 U.S. 843, 863-864, 94 S.Ct. 2811, 2821-2822, 41 L.Ed.2d 514 (1974) (Powell, J., dissenting). But the press does not have a monopoly on either the First Amendment or the ability to enlighten. *Cf. Buckley v. Valeo*, 424 U.S., at 51 n. 56, 96 S.Ct., at 650; *Red Lion Broadcasting Co. v. FCC*, 395 U.S. 367, 389-390, 89 S.Ct. 1794, 1806-1807, 23 L.Ed.2d 371 (1969); *New York Times Co. v. Sullivan*, 376 U.S. 254, 266, 84 S.Ct. 710, 718, 11 L.Ed.2d 686 (1964); *Associated Press v. United States*, 326 U.S. 1, 20, 65 S.Ct. 1416, 1424, 89 L.Ed. 2013 (1945).

*Bellotti*, 435 U.S. at 781-82 (footnotes omitted).

broadcasting station ..., Web site, newspaper, magazine, or other periodical publication ..." except when the facility is "owned or controlled by any political party, political committee, or candidate ...." *See* 11 CFR §§100.73(contributions), 100.132 (expenditures). For media facilities owned by a party, candidate, or political committee, federal law exempts only news stories that meet other criteria to ensure fairness.[4] However, fairness, balance, or lack of bias are not requirements for media outlets not owned or controlled by a party, candidate, or political committee. *Id.*

Courts interpreting this provision have set forth a two-part analysis. *Federal Election Comm'n v. Phillips Publishing, Inc.*, 517 F.Supp. 1308, 1312-13 (D.D.C. 1981) (citing *Reader's Digest Ass'n v. Federal Election Comm'n*, 509 F.Supp. 1210 (S.D.N.Y. 1981).

> Under the *Reader's Digest* procedure, the initial inquiry is limited to whether the press entity is owned or controlled by any political party or candidate and whether the press entity was acting as a press entity with respect to the conduct in question. ... If the press entity is not owned or controlled by a political party or candidate and it is acting as a press entity, the FEC lacks subject matter jurisdiction and is barred from investigating the subject matter of the complaint.

*Phillips Publishing*, 517 F.Supp. at 1313 (citations omitted). In other words, provided an independent press entity acts "as a press entity," the content of any political message it disseminates is largely

---

[4] For a candidate-owned facility, only a news story:

> (a) That represents a *bona fide* news account communicated in a publication of general circulation or on a licensed broadcasting facility; and

> (b) That is part of a general pattern of campaign-related news accounts that give reasonably equal coverage to all opposing candidates in the circulation or listening area, is not a contribution.

11 CFR §100.73(a)(b).

irrelevant for federal campaign finance purposes. A number of states have adopted similar explicit media exceptions as part of their campaign finance laws to accommodate First Amendment values.

## C. *Maryland Campaign Finance Law*

### *Regulation of Contributions and Expenditures*

The Maryland Campaign Finance Law regulates contributions and expenditures in connection with State elections. *See* Annotated Code of Maryland, Election Law Article, §13-101 *et seq.* Under that law, all campaign finance activity must be conducted through a "campaign finance entity." EL §13-202(a). In addition, the establishment of a campaign finance entity is made an express prerequisite to the filing of a certificate of candidacy for State office. EL §13-202(b).

Once established, the campaign finance entity is to file regular reports with SBE of all contributions received and expenditures made. *See* EL §13-304. SBE publishes a Summary Guide to assist candidates, contributors, officers of campaign finance entities, and others in complying with these requirements. EL §13-103. Campaign finance obligations are continuing in nature. So long as an individual maintains a campaign finance entity registered with SBE, the campaign remains subject to the Title 13's bookkeeping requirements, periodic reporting duties, and contribution limits. *See, e.g.*, EL §13-312; *see also* EL §13-305 (treasurer may file affidavit in lieu of report in certain circumstances). Winding down or terminating a campaign finance entity requires compliance with several provisions of the Election Law Article, including those relating to disposition of remaining campaign funds and the filing of a final report. EL §§13-247, 13-310, 13-311.

### *Contribution Limits and In-kind Contributions*

The Campaign Finance Law generally imposes limits on a donor's political contributions based on a four-year election cycle. *See* EL §1-101(w) (defining "election cycle"). In general, during any election cycle, the statute caps a donor's contributions to any one candidate at $4,000, and at $10,000 to all campaign finance entities in the aggregate. EL §13-226. The State election law defines a "contribution" as "the gift or transfer, or promise of gift or transfer, of money *or other thing of value* to a campaign finance entity to promote or assist in the promotion of the success or defeat of a candidate, political party, or question." EL §1-101(o)(1) (emphasis

added). When a contribution is made in a form other than a direct gift of money to the campaign treasurer, it is considered an in-kind contribution.

The Summary Guide provides, in relevant part, the following explanation of an in-kind contribution:

> An in-kind contribution includes any thing of value (except money). For example: a person can contribute bumper stickers to a candidate's committee. The amount of the contribution equals the fair market value of the bumper stickers. An in-kind contribution counts towards the donor's contribution limits.

Summary Guide – Maryland Candidacy & Campaign Finance Laws (revised July, 2006) at 27. In addition to giving a thing of value directly to a campaign, there are two other generic situations in which an in-kind contribution occurs: if a payment is made to a third party to defray a charge incurred by the campaign (*see, e.g.*, EL §13-602(a)(4)(i)), or if spending in support of a candidate is done in "coordination" with the campaign. *Compare* EL §1-101(bb) (defining an "independent expenditure," which is *not* treated as an in-kind contribution). The complaint letter appears to suggest that the broadcast of a talk show hosted by a candidate might be viewed as either a donation of free air-time or as an expenditure by the station made in coordination with the campaign.

## II

### Analysis

In contrast to federal law and the campaign finance laws of some other states, Maryland statutes do not expressly except from the definition of a "contribution" the imputed cost or fair market value of media coverage of a campaign. *See* EL §13-101(l) (defining "contribution"). Even so, it has been SBE's longstanding administrative practice not to regard traditional media coverage of candidates as in-kind contributions. This policy has been followed without regard to the political content, if any, of the candidate's message. SBE's past practice is thus entirely appropriate in light of the First Amendment concerns outlined above. Intrusive inquiry into the content of a candidate's speech inevitably has a chilling effect on free expression. Faced with a possible campaign violation, some

candidates would doubtless censor their remarks, inhibiting the quantity and quality of public discourse.

On the other hand, the First Amendment does not exempt media outlets from all campaign finance regulation. Unrestricted campaign finance activity could result in the exact type of harm that contribution limits were intended to prevent.[5] Certainly, the possibility exists that elected officials could become too reliant upon or indebted to a media company in the same way this could occur with other private interests. *See, e.g.*, *Citizens United*, 130 S.Ct. at 905 (expressing concerns about unequal treatment of corporations under federal media exception). This concern is legitimate.[6] However, it seems plain that mechanical application of the in-kind rule to prevent possible misconduct by broadcasters would not be sufficiently "tailored" to the problem to meet the First Amendment standard.

As an example, because campaign finance obligations exist so long as a "candidate" maintains a campaign finance entity to support any current or future campaign – regardless of current activity or an intention to run – the in-kind rule could in theory be applied to any past media appearance by the candidate, at any time, throughout the entire course of the candidate's State political career. In addition, the in-kind requirements could be triggered by others as well, including a spokesperson, strategist, consultant, or any other person, acting in coordination with the campaign. Thus, a significant amount of core political speech might be suppressed solely to guard against a mostly theoretical, or at least rare, threat of abuse. This is regulation the First Amendment does not allow. *See, e.g., Citizens United*, 130 S. Ct. at 891 (First Amendment requires

---

[5] Candidates often promote their candidacies through paid radio advertisements. If a radio station were to permit a candidate to air a campaign ad for free when it charged other advertisers, including other candidates, the free air time would be an in-kind contribution to the candidate by the radio station. Similarly, if a third party paid for the candidate's ad on behalf of the campaign, that, too, would be an in-kind contribution.

[6] Although we recognize the potential for abuse, in the "free media" context this risk is arguably less as compared to other forms of in-kind contribution. In the case of a public broadcast, there can be no question as to the relationship between the candidate and the broadcaster. This may, in itself, encourage candidates and broadcasters to remain at arms-length with respect to policy issues affecting the company.

giving "benefit of any doubt to protecting rather than stifling speech.") (quoting *WRTL*, 551 U.S. at 469 (2007)).

Our Office is not aware of any similar cases in which a federal or state agency has successfully upheld a finding that media commentary by a candidate (or those coordinating with the candidate's campaign) amounted to an impermissible in-kind contribution. *See, e.g., San Juan County v. No New Gas Tax*, 157 P.3d 831 (Wash. S. Ct. 2007) (criticism of gas tax by radio talk show hosts during regularly scheduled program for which the broadcaster did not normally require payment was not an in-kind contribution to political committee seeking to overturn tax by ballot initiative); 2003 Ariz. Op. Atty. Gen. 12, 2003 WL 23966055 (Ariz. A.G.) (candidate's media appearance not a contribution under statutory exception); *In re Dornan*, MUR 4689, Statement of Reasons ("SOR") of Chm'n Wold and Commr's Elliott, Mason, and Sandstrom (FEC "Matters Under Review," Feb. 14, 2000) (concluding media exception applies to guest host of radio show, whether before or after becoming a candidate for federal office).[7]

Nor does the absence of a statutory media exception require a different outcome. For example, the Arizona Attorney General noted that that Office had reached the same conclusion before the exception was added to the Arizona Code. "In 1988, even though there was not yet a news media exemption in Arizona's campaign finance laws, the Arizona Attorney General opined that 'regulation of newspaper editorials would clearly run afoul of constitutional guarantees of freedom of the press..." 2003 Ariz. Op. Atty. Gen. No. I03-003 at 2 (quoting Arizona Attorney General Opinion No. 188-020 (1988)).

Thus, even if a state lacks an explicit media exception in its campaign finance law, one may be implied in construing the law consistent with constitutional limitations. For example, in *Laffey v. Begin*, 137 Fed. Appx. 362 (1st Cir. 2005), the Rhode Island board of elections brought an enforcement action against an incumbent mayor, alleging that he had received an in-kind contribution when a local radio station allowed him to host a weekly radio show. The mayor sued, claiming that the board action abridged his First Amendment rights. Eventually, the board agreed to suspend its

---

[7] FEC Advisory Opinions and enforcement actions ("Matters Under Review") are available on-line at the FEC's website: www.fec.gov (last visited May 20, 2010).

enforcement action and the First Circuit remanded the case for an assessment of how the state election law accommodated the First Amendment.

The clear teaching of these authorities is that any enforcement policy that involves close regulation of the content of political speech can impermissibly threaten the values protected by the First Amendment. The Constitution is better served by a content-neutral analysis specifically targeting efforts to evade applicable campaign finance limits. *See, e.g., San Juan County,* 157 P.3d at 841 (observing that Washington Code "limits judicial inquiry into the content of the speech, focusing instead on the content-neutral question of whether the radio station ordinarily would collect a fee for the broadcast")*; compare* EL §13-602(a)(4)(i) (prohibiting persons from defraying costs of campaign finance entity directly or indirectly); *see also Federal Election Comm'n v. Massachusetts Citizens for Life*, 479 U.S. 238, 250-51 & n.5 (1986) (holding, in part, that a "Special Edition" newsletter expressly advocating election of pro-life candidates was not covered by FECA's media exception and was not akin to the normal business activity of a press entity, relying on content-neutral factors).

It is true that in some earlier cases, the FEC sought to put content restrictions on the on-air statements of candidates. *See, e.g.*, FEC Advisory Op. 1977-42 (limiting candidate's permissible speech as host of public affairs radio program). But that is clearly no longer the case, provided the candidate appears on an "independent" media outlet that is performing its normal press function. *See In re Dornan*, MUR 4689, SOR of Com'r Wold *et al.*; *see also* FEC Advisory Op. 2005-19, at 5 (regarding press exemption for non-candidate despite "lack of objectivity" in coverage). Nor does the identity of the host change the analysis. Whatever control over program content a host might exercise, the relevant consideration under FECA is ownership or control of the station itself. *Id.* Nor is there a constitutionally relevant distinction between programs where a candidate acts as "host," as compared to those where a candidate responds to questions from a friendly interviewer or audience of supporters. For First Amendment purposes, the identity of the speaker should be irrelevant. *Citizens United,* 130 S. Ct. at 898 ("Prohibited, too, are restrictions distinguishing among different speakers, allowing speech by some, but not by others.").

To avoid a potential chilling effect on free expression, courts are likely to give considerable leeway to the editorial or programming decisions of media companies, including a company's choice of host. *See, e.g., Miami Herald Publishing Co. v. Tornillo*, 418 U.S. 241, 244 (1974) (holding 'right of reply' statute to be an unconstitutional intrusion into the function of editors).[8] Therefore, generally speaking, the use of objective, content-neutral criteria is an approach better suited to the First Amendment. In this regard, some factors to consider might include whether the program at issue is consistent with the station's usual format, whether it was created well in advance of the campaign season or to provide a campaign vehicle for the candidate, and whether the station would ordinarily have collected a fee for the broadcast. The purpose of these questions would be to help SBE assess whether otherwise protected media activity is in reality an effort to promote a particular candidacy.

### III

### Conclusion

In light of the more than 35 years' experience of courts and the FEC in interpreting a media exception consistent with the First Amendment, federal law probably offers the most useful guidance on the issue you have asked about. In line with that guidance, we would advise that, in considering possible misconduct relating to the coverage of political discussion by a candidate or potential candidate, the focus should remain on activity by the media outlet that appears to be inconsistent with its ordinary press or broadcast function.

---

[8] As the Supreme Court observed in *Miami Herald*:

"The choice of material to go into a newspaper, and the decisions made as to limitations on the size and content of the paper, and treatment of public issues and public officials – whether fair or unfair – constitute the exercise of editorial control and judgment. It has yet to be demonstrated how governmental regulation of this crucial process can be exercised consistent with First Amendment guarantees of a free press as they have evolved to this time."

418 U.S. at 258 (citations omitted).

Ordinarily, SBE would not analyze the broadcast of a candidate's political remarks as a possible in-kind contribution. The reason advanced for doing so here appears mainly to derive from the participation of former Governor Ehrlich as a host or co-host of the broadcast, and the control over the show's content that circumstance implies. But as is explained above, this consideration does not appear to be decisive, or even greatly relevant, for First Amendment purposes. Similarly, charges of media bias or a lack of balanced coverage do not provide grounds for subjecting a particular media outlet to campaign finance regulation where it would not be otherwise. Consequently, we see no reason in this situation for SBE to depart from its usual practice.

Douglas F. Gansler
*Attorney General*

Jeffrey L. Darsie
*Assistant Attorney General*

Robert N. McDonald
*Chief Counsel*
*Opinions and Advice*

**Editor's Note:**

This opinion was originally issued as a letter of advice.

J. JOSEPH CURRAN, JR.
ATTORNEY GENERAL

RALPH S. TYLER
NORMAN E. PARKER, JR.
DEPUTY ATTORNEYS GENERAL



ROBERT A. ZARNOCH
ASSISTANT ATTORNEY GENERAL
COUNSEL TO THE GENERAL ASSEMBLY

RICHARD E. ISRAEL
KATHRYN M. ROWE
SANDRA J. COHEN
ASSISTANT ATTORNEYS GENERAL

# THE ATTORNEY GENERAL

# OF MARYLAND

OFFICE OF

COUNSEL TO THE GENERAL ASSEMBLY

104 LEGISLATIVE SERVICES BUILDING

90 STATE CIRCLE

ANNAPOLIS, MARYLAND 21401-1991

BALTIMORE & LOCAL CALLING AREA (410) 841-3889

WASHINGTON METROPOLITAN AREA (301) 858-3889

TTY FOR DEAF - ANNAPOLIS, (410) 841-3814 - D.C. METRO, (301) 858-3814

August 25, 1994

The Honorable George W. Owings, III
217 House Office Building
Annapolis, Maryland 21401-1991

Dear Delegate Owings:

You have asked for advice concerning political use of public access channels. Specifically, you have asked whether a public access channel may be used by one political candidate to the exclusion of another candidate. You have also asked whether a public access channel may be used for political gain and, if so, whether it must be considered an in-kind contribution. It is my view that a candidate for public office may use a public access channel unless such use is barred by the franchise agreement. 1/ However, once a candidate has used the public access channel other candidates for the same office must be given equal access on request. Finally, use of the public access channel need not be counted as an in-kind contribution.

Federal law permits a franchising authority to require a cable operator to designate a channel or channels for public, educational or governmental use. 47 U.S.C. §531(a). Public access stations typically operate on a first-come, first-serve basis, and are not subject to editorial control by the cable operator, 47 U.S.C. §531(e). Public access is not defined by

---

1 I have not researched whether the First Amendment would permit a franchising authority to bar political uses from public access. It should be noted, however, that restrictions based on viewpoint are not permitted. Missouri Knights of the KKK v. Kansas City, 723 F.Supp. 1347 (W.D.Mo. 1989).

federal law or regulations. Thus, to the extent any limits exist on public access, they would be imposed as a part of the franchise agreement. 2/ I called Jones Intercable to determine what their guidelines were for public access and was told that no one was in who could give me that information. If the franchise agreement does not limit use of public access by candidates for public office, that use is permitted.

Federal regulations governing cable television require that a cable television system that permits the use of its facilities by a legally qualified candidate for public office "shall afford equal opportunities to all other candidates for that office to use such facilities." 47 C.F.R §76.205(a). 3/ A request for equal opportunity must be submitted within one week of the use by the other candidate. 47 C.F.R. §76.205(c). Thus, a candidate for public office may not use a public access channel to the exclusion of other candidates.

Article 33, §1-1(a)(5) defines a contribution to include "the gift, transfer or promise of gift or transfer of money or other thing of value" to a candidate. Similarly, Article 33, §26-9(d) places limits on the contribution of "money or thing of value" to a candidate. A "thing of value" is a term of art referring to an in-kind contribution. If a cable system were to make leased access or commercial time for which there is ordinarily a charge available to a candidate without charge, it could be argued that that would constitute an in-kind contribution. However, public access is available to any member of the public free of charge, on a first-come, first-serve basis, and therefore has no fair market value. As such, it is my view that use of a public access channel by a candidate does not give rise to an in-kind contribution. If the law were interpreted otherwise, the cable system would be held to have made an in-kind contribution every time a candidate used its public access facilities, even though it lacked the legal authority to prevent that use. If candidates used the system with any frequency, the system could be found to have violated Article 33, §26-9(d) even though it would be powerless to stop the broadcasts. Therefore, it is my view that use of a public access channel by a candidate should not be treated as an in-kind contribution.

---

2 For example, some franchises require that public access programming originate locally. Chicago Cable Communications v. Chicago Cable Com'n., 678 F.Supp. 734 (N.D. Ill. 1988).

3 "Use" means a candidate appearance (including by voice or picture) or political advertisement that is not exempt as bona fide news broadcast and that is controlled, approved or sponsored by the candidate or the candidate's committee. 47 C.F.R. §76.205(b).

I hope that this is responsive to your inquiry.

Sincerely,

Kathryn M. Rowe
Assistant Attorney General


KMR:ss
cc:  Mary Lunden